TOWNSHIP OF WEST ORANGE; Lauren Massader, Individually and on Behalf of Her Infant Child, Zachary Massader; Katherine Howland; and Elizabeth Shelley, Plaintiffs,

v.

Christine Todd WHITMAN, Governor of the State of New Jersey; Peter G. Verniero, Attorney General of the State of New Jersey; William Waldman, Commissioner of the Department of Human Services of the State of New Jersey;

Alan Kaufman, Director of the Division of Mental Health Services of the Department of Human Services of the State of New Jersey; U.S. Department of Housing and Urban Development; and Project Live, Inc., Defendants.

Civil Action No. 98–1070.

United States District Court, D. New Jersey.

April 29, 1998.

410

Alpert & Levy, Clark E. Alpert, West Orange, NJ, for Township of West Orange, Lauren Massader, Katherine Howland, Elizabeth Shelley.

Peter Verniero, Atty. Gen. of New Jersey, by Judith A. Nason, Deputy Atty. Gen., Trenton, NJ, for State Defendants.

Faith S. Hochberg, U.S. Atty., by Susan C. Cassell, Deputy Chief, Civil Div., Newark, NJ, for Dept. of Housing and Urban Development.

Jeffrey R. Kuschner, Montclair, NJ, for Project Live, Inc.

New Jersey Protection and Advocacy, Inc., Sarah W. Mitchell, Executive Director by Deborah Ann Wean, Managing Attorney, Trenton, NJ, for Current and Potential Residents and New Jersey Protection and Advocacy, Inc.

Hausman and Sunberg, by Kenneth M. Sunberg, Caldwell, NJ, for St. Cloud Civic Association.

## OPINION

BISSELL, District Judge.

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction and on cross-motions to dismiss the Complaint under Fed.R.Civ.P. 12(b)(6) by Defendants Whitman, Verniero, Waldman, and Kaufman ("the State Defendants"), by Defendant–Intervenors New Jersey Protection & Advocacy, Inc. ("NJP & A") and Residents and Prospective Residents of Project Live Community Residences in West Orange, who seek, in the alternative, summary judgment, and by the U.S. Department of Housing and Urban Development ("HUD"), which also seeks dismissal under Fed.R.Civ.P. 12(b)(1). Defendant Project Live joins in the other Defendants' and Defendant–Intervenors' motions to dismiss. Plaintiff–Intervenor the St. Cloud Civic Association joins in Plaintiffs' briefs in support of the preliminary injunction and in opposition to the motions to dismiss.

Plaintiff filed the Complaint in this action on March 13, 1998. It contains counts titled: "42 *U.S.C.* § 1983—Declaratory Judgment and Injunctive Relief—Procedural Due Process" (Count I), "42 *U.S.C.* § 1983—Declaratory Judgment and Injunctive Relief Substantive Due Process" (Count II), "Declaratory Judgment and Injunctive Relief— Arbitrary and Capricious Nature of Siting" (Count III), "Declaratory Relief— § 66.1 Void" (Count IV), "Declaratory Judgment— Federal Fair Housing Act" (Count V), "Ultrahazardous Use Without Due Safeguards—Project Live" (Count VI), and "Declaratory Judgment—First Amendment" (Count VII).

On March 18, 1998, the Court denied Plaintiffs' application for temporary restraints and issued an order to show cause why a preliminary injunction should not be entered. The Court granted motions to intervene by Plaintiff–Intervenor and Defendant–Intervenors on March 23, 1998. By an order entered March 26, 1998, Magistrate Judge Haneke established a schedule for discovery related to the preliminary injunction hearing. Defendants and Defendant–Intervenors appealed to this Court parts of that order that related to disclosure of patient histories. After *in camera* review of the documents in question, the Court, by order entered April 14, 1998, modified the Magistrate Judge's order to reflect that they would not be disclosed to Plaintiffs.

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367.

## FACTS

This action relates to the siting of two group homes for people with mental illness in residential neighborhoods in the Township of West Orange. The group homes at issue are located at 97 Edgewood Avenue and 19 Dogwood Drive respectively. (Compl.¶ 21).

Plaintiff Township of West Orange is the municipality where the community residences are situated. (*Id.* ¶ 1). Plaintiff Lauren Massader, who sues individually and on behalf of her infant son Zachary Massader, is a resident of 8 Elf Road, West Orange, which is adjacent to the Edgewood Avenue home. (*Id.* ¶ 3). Plaintiffs Katherine Howland and Elizabeth Shelley reside at 23 Dogwood Drive, adjacent to the Dogwood Drive home. (*Id.* ¶ 4). Plaintiff–Intervenor St. Cloud Civic Association represents the St. Cloud neighborhood and residents whose properties are located adjacent and near to the Edgewood Avenue home. (Intervenor Compl. ¶ 1).

Defendant Christine Todd Whitman is the Governor of the State of New Jersey, allegedly responsible for enforcing the State Constitution and laws. (Compl.¶¶ 7–8). Defendant William Waldman is the Commissioner of the New Jersey Department of Human Services ("DHS"), allegedly responsible for DHS decisions and actions, including the licensing, funding and supervising of community residences. (*Id.* ¶ 9). Defendant Alan Kaufman is the Director of the Division of

Mental Health Services of DHS, allegedly responsible for State decisions relating to state psychiatric hospitals and the implementation of community residences. (*Id.* ¶ 10). Defendant Peter Verniero is Attorney General of the State of New Jersey, "arguably an essential party because the validity of state law and/or regulation is implicated by this lawsuit." (*Id.* ¶ 11). These Defendants, the State Defendants, are sued individually and in their official capacities. (Am.Compl.¶ 1).

Defendant HUD is the instrumentality of the United States government charged with enforcing the Fair Housing Act and its amendments, 42 U.S.C. § 3601 et seq. (Compl.¶ 13). Defendant, Project Live, Inc. ("Project Live") is the owner and operator of a number of community residences, including the two specifically at issue in this litigation. (*Id.* ¶ 14).

Defendant–Intervenor NJP & A is a nonprofit corporation designated by Governor Whitman to provide legal and advocacy services for people with disabilities in the state pursuant to 42 U.S.C. §§ 6041–6043 and §§ 10801–10807. The other Defendant–Intervenors are residents and potential residents of the two group homes at issue here. (Wean Letter, Mar. 17, 1998 (seeking leave to file motion to intervene)).

Plaintiff's seventy-eight page Complaint [1] alleges, at its foundation, that, in connection with the impending closure of Marlboro Psychiatric Hospital, the State Defendants have contracted with Project Live to open two group homes in residential neighborhoods in the Township of West Orange, one at Edgewood Avenue and the other at Dogwood Drive, under a statutory and regulatory scheme that inadequately ensures the safety of the surrounding community and wrongfully denies the community notice and a hearing as to where residences of that type will be located. The Complaint alleges:

> [T]he present system (a) arbitrarily includes, for group home-placement, persons with a wide array of mental conditions, including mentally ill sub-populations posing heightened risks of violence[,] with deliberate indifference to the threat to the rights of infant children and others placed in danger by the State as a consequence; (b) fails to perform any analysis of the impact of community residences upon the neighborhoods in which they are placed[,] including a complete failure to consider potential risks to public safety by the specific use proposed; (c) arbitrarily fails to establish or implement security parameters to protect local citizens; (d) deprives citizens directly affected by the placement of these facilities in their communities, and indeed literally adjacent to them in a number of cases, of any notice, information, or any opportunity to be heard regarding the establishment of the facility; and (e) constitutes an arbitrary exercise of the zoning power.

(Compl.¶ 18).

According to the Complaint, the Dogwood Drive home and the Edgewood Avenue home will each house five outpatients from Marlboro. (*Id.* ¶ 40). The Complaint further alleges, based on "skeletal information provided to the public by Project Live," that "the intended inhabitants of the Two [Dogwood Drive and Edgewood Avenue] Facilities" are persons who "(a) had been involuntarily committed at Marlboro; (b) have been diagnosed with schizophrenia, bipolar disorder (also known as 'manic depression'), 'MICA' (Mentally Ill Chemical Abusers), or depression; and (c) have been unable to handle prior 'outplacements' into similar assisted-care settings." (*Id.* ¶ 21). With reference to supporting studies and an expert report, the Complaint alleges that people in these three categories pose a heightened risk of dangerousness. (*See id.* ¶¶ 38, 49). In addition, the Complaint alleges that the risk of harm to young children in the neighborhoods of these group homes is especially severe since "children witnessing violence or violence-related activities (such as 'acting out') are especially

---

1. The Court reminds Plaintiffs that Fed.R.Civ.P. 8(a) provides: "A pleading which sets forth a claim for relief ... shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) *a short and* *plain* statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks...." *Id.* (emphasis added).

susceptible to emotional trauma." (*Id.* ¶ 105).

The Complaint further alleges, "There will be essentially no security at these Facilities." (*Id.* ¶ 21). More specifically, it contends, "[T]hese group homes will have, as their total measure of 'security,' a single supervisor, probably with no more than a college degree (which degree may or may not be in a category relevant to psychology, and certainly not relevant to security). This attendant will have no true security function; the group-home residents will admittedly be given free and unaccompanied 'run' of the neighborhood, without locked doors, alarms, or any other security measures." (*Id.* ¶ 38). The Complaint alleges that there is no assurance that this single staff person will have qualifications beyond a college degree and three weeks' training. (*Id.* ¶ 40).

Plaintiffs also seek a declaratory judgment and injunctive relief to protect their First Amendment rights. In connection with this claim, the Complaint alleges: "HUD participated with the State Defendants and Project Live at a meeting with area residents where a brochure describing the Fair Housing Act and its enforcement mechanisms were [sic] distributed. This constituted at least an implicit threat of retribution for any opposition to the Project Live Facilities, thus having a chilling effect on the Plaintiffs' right of expression." (*Id.* ¶ 134).

### *ANALYSIS*

**I. Standard**

**A. Motions to Dismiss**

Fed.R.Civ.P. 12(b)(1) allows motions to dismiss "for lack of jurisdiction over the subject matter." Fed.R.Civ.P. 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In disposing of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must operate on the assumption that the factual allegations in a complaint or counterclaim are true. *Neitzke,* 490 U.S. at 326–27, 109 S.Ct. 1827. A Rule 12(b)(6) motion to dismiss may be granted if the opposing party would not be entitled to relief under any set of facts consistent with the allegations in the complaint or counterclaim. As the Supreme Court stated in *Neitzke:*

> [n]othing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. On the contrary, if as a matter of law "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," *Hishon, supra,* 467 U.S. at 73, 104 S.Ct. at 2232, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one. What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.

*Id.* at 327, 109 S.Ct. 1827. Of course, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997) (citations omitted).

Here, both Plaintiffs and Defendants have submitted materials outside the pleadings. This is appropriate since Defendants' and Defendant–Intervenors' cross-motions to dismiss in this matter have been presented at the same time as Plaintiffs' motion for a preliminary injunction. However, Fed. R.Civ.P. 12(b) provides: "If, on a [12(b)(6) motion] to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." Fed.R.Civ.P. 12(b); *see also Hilfirty v. Shipman,* 91 F.3d 573, 578 (3d Cir.1996); *De Tore v. Local # 245 of the Jersey City Pub. Employees Union,* 615 F.2d 980, 983 (3d Cir.1980).

The Court agrees with Plaintiffs that it would be premature to consider a motion for summary judgment in this matter.[2] Howev-

---

2. Only Defendant–Intervenors' motion to dismiss is explicitly, in the alternative, a motion for sum-

er, the Court determines that Defendants' and Defendant–Intervenors' motions to dismiss do not require it to consider documents beyond the pleadings and therefore do not necessitate converting those motions to motions for summary judgment. Accordingly, as the Court indicated in its April 21, 1998 letter to counsel, the Court will exclude from its consideration of the motions to dismiss matters outside the pleadings that have been submitted in connection with the motion for a preliminary injunction. Defendants' and Defendant–Intervenors' motions will continue to be treated as motions to dismiss. (*See* Letter, Apr. 21, 1998).

### B. Preliminary Injunction Standard

■■■■ The Third Circuit has articulated the following standard for a trial court to apply in deciding a motion for a preliminary injunction:

> In considering a motion for preliminary injunctive relief, a court must carefully weigh four factors: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of such relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest.

*SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985); *see also AT & T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994), *cert. denied*, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197–98 (3d Cir. 1990); *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980). The purpose of a preliminary injunction is to preserve the status quo pending an action's final adjudication on the merits. *Continental Group*, 614 F.2d at 356. An "injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT & T v. Winback and Conserve Program*, 42 F.3d at 1427 (citing *Opticians Ass'n v. Independent Opticians*,

mary judgment.

920 F.2d 187, 192 (3d Cir.1990); *Merchant and Evans, Inc. v. Roosevelt Bldg. Prods.*, 963 F.2d 628, 632–33 (3d Cir.1992)).

## II. Application

The Court determines that Plaintiffs' Complaint in its entirety fails to state a claim upon which relief can be granted. Accordingly, Plaintiffs' Complaint will be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). The Court will address each of Plaintiffs' claims in turn.

### A. Count I: "42 U.S.C. § 1983—Declaratory Judgment and Injunctive Relief—Procedural Due Process" and Count II: "42 U.S.C. § 1983—Declaratory Judgment and Injunctive Relief–Substantive Due Process"

In Counts I and II of Plaintiffs' Complaint, Plaintiffs seek declaratory judgments and injunctive relief on the basis that the state Defendants have deprived them of their Fourteenth Amendment rights to substantive and procedural due process in violation of 42 U.S.C. § 1983. The claims in both of these counts fail as a matter of law, because Plaintiffs have not alleged any constitutionally cognizable injury.

■■■■ In Count I of their Complaint, Plaintiffs claim that the State Defendants' present system and practices deprive them and the other citizens of the State of their "liberty interests in personal security" and their "property interests" "without prior notice and opportunity for a hearing," thereby denying them their right to procedural due process. (*See* Compl. ¶¶ 153–55). They seek a declaratory judgment that the State Defendants may not fund, license, assist or maintain either the Edgewood Avenue home or the Dogwood Drive home, or any other community residences, without prior notice to Plaintiffs and the surrounding community and an opportunity for a hearing for "persons such as plaintiffs whose security and safety interests are affected thereby." (*Id.* ¶ 157(a)). They also seek preliminary and permanent injunctive relief prohibiting the State Defendants from funding or licensing

community residences, including the two group homes at issue in this case, until the State promulgates and implements "(i) procedures for advance notification to municipal officials and persons residing in the surrounding neighborhoods of a proposed community residence, and (ii) proper regulations providing for security and supervision, and listing specific criteria and characteristics of group homes requiring particular levels of security and supervision." (*Id.* ¶ 157(b)).

Count II of Plaintiffs' Complaint alleges that the State Defendants' present system of funding and licensing community residences deprives Plaintiffs of their substantive due process rights. Plaintiffs allege that "the citizens of the State, and the Individual Plaintiffs in particular, are deprived of their liberty interests in personal security through arbitrary and capricious policies and procedures, whereby the personal safety of the persons residing in the vicinity of proposed community residences are [sic] knowingly disregarded by the State . . . ." (*Id.* ¶ 161). They further allege "[a]dditionally and in the alternative," that "the Individual Plaintiffs have . . . been placed within a zone of 'state-created danger' depriving them of their liberty interest in personal safety and security." [3] (*Id.* ¶ 162). They state that "the arbitrary approval and funding of community residences without consideration of the impact of the facility upon the surrounding community also cons[t]itutes an irrational exercise of the State's zoning powers, and thus constitutes a deprivation of the plaintiff's property interests in violation of plaintiffs' substantive and procedural due process rights." (*Id.* ¶ 163).

Again, they seek a declaratory judgment that the State Defendants may not fund or license community residences until the state promulgates procedures and policies for considering the impact on the neighboring community and for assuring adequate safeguards for the community's safety. (*Id.* ¶ 165(a)). They also seek preliminary and permanent injunctions preventing Project Live from operating either of the two homes and preventing the State Defendants from funding or licensing any community residences, including the two homes, until it promulgates and implements such policies and procedures. (*Id.* ¶ 165(b)).

█ The claims in Counts I and II of Plaintiffs' Complaint are predicated on 42 U.S.C. § 1983.[4] "By itself, § 1983 does not create any rights, but provides a remedy for violations of those rights created by the Constitution or federal law. . . . In order to state a claim, plaintiff[s] must show that defendants, acting under color of state law, deprived [them] of a right secured by the Constitution or the laws of the United States." *Morse v. Lower Merion School District,* 132 F.3d 902, 906–07 (3d Cir.1997) (citations omitted).

The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Count I alleges a violation of procedural due process. In *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the United States Supreme Court explained:

> Application of this prohibition requires the familiar two-stage analysis: We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of "life, liberty or property;" if protected interests

---

3. Plaintiffs claim:
 [T]he Individual Plaintiffs (a) are members of the discrete class of persons residing in the immediate vicinity of the Two Facilities; (b) who are being placed by the State Defendants in a position of foreseeable risk; (c) that is created by the placement of patients with histories presenting a significantly increased risk of violent conduct in the Two Facilities (i) without regard for the suitability of the location, (ii) without prior screening, (iii) without prior supervision, and, to the extent relevant (iv) for ulterior motives relating to the closure of Marlboro.
 (Compl.¶ 162).

4. Section 1983 provides in relevant part:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. § 1983.

are implicated, we then must decide what procedures constitute "due process of law." *Id.* at 672, 97 S.Ct. 1401. Here, Plaintiffs' claims fail to implicate a protected interest for procedural due process purposes, so the question of what process is due is moot. In addition, they have failed to allege the deprivation of any rights protected by the Fourteenth Amendment's guarantee of substantive due process.

At the outset, the Court notes that Plaintiffs have not presented (and the Court has not found) any cases holding that any scheme by which a state supports housing in the community for mentally ill people generally, or for a subset of particularly dangerous mentally ill people as is alleged here,[5] implicates the Fourteenth Amendment procedural or substantive due process rights of neighbors or the municipality in which any such housing is located. There simply are no cases where courts have treated conduct of the type alleged here as rising to the level of a constitutionally cognizable injury.

 Plaintiffs claim that the State Defendants have deprived them of amorphous "property interests." "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ....'" *Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Plaintiffs argue that the State Defendants have breached an obligation to consider local interests before making siting and/or licensing decisions, and they state in their Complaint that "[t]he legitimate expectation of this obligation being honored, gives rise to federal and State due process rights in favor of Plaintiffs." (Compl. ¶¶ 128–30). The Court determines that, to the extent that the State has any such obligation, it has not been breached here. However, the Court will address this

argument below because it apparently forms the basis for Count III of Plaintiffs' Complaint. Plaintiffs have identified no other source for the property interests they allege, and the Court can find none.

In *BAM Historic District Association v. Koch,* 723 F.2d 233 (2d Cir.1983), Plaintiffs alleged that New York City's establishment of a homeless shelter in their neighborhood deprived them of their property rights without due process of law. The Court held that no protected property interest was implicated. Plaintiffs here, like those plaintiffs apparently, "are not claiming that their property has been taken or their use of it so drastically regulated as to destroy its value, *see Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)." 723 F.2d at 237. To the extent that they, like the *BAM Historic District Association* plaintiffs, claim that "the ... operation of the [housing] in the vicinity of their property will cause a decline in property values," *id.,* the Court concurs with the assessment of the United States Court of Appeals for the Second Circuit, that "[g]overnmental action of that sort has never been held to 'deprive' a person of property within the meaning of the Fourteenth Amendment." *Id.*

Plaintiffs also claim to have been deprived of a liberty interest in "personal security." In *Ingraham v. Wright,* 430 U.S. at 674, 97 S.Ct. 1401, a case on which Plaintiffs rely, the Supreme Court recognized that corporal punishment of children in schools implicates a Fourteenth Amendment liberty interest in "personal security" of which a person may not be deprived without due process of law. The Court does not infer from the facts of *Ingraham* that any such right is implicated by state-supported housing of mentally ill individuals in the community, even where, taking Plaintiffs' allegations to be true, as the Court must on a Fed.R.Civ.P. 12(b)(6) motion to dismiss, inadequate safety precautions are

---

**5.** The Court does not delve into the truth or falsity of this claim or the claim that there will be essentially no security at the Project Live homes since on this motion under Rule 12(b)(6) it is required to accept Plaintiffs' allegations as true.

The Court need not reject Plaintiffs' assertions about the potential dangerousness of the residents of the group homes or the lack of security there in order to determine that Plaintiffs' claims are insufficient as a matter of law.

taken and such individuals' past involuntarily commitments, past failures in community settings, or particular diagnoses indicate that they pose a heightened risk of dangerousness to the community. Without more, *Ingraham*'s recognition of a right to personal security in the context of state infliction of bodily punishment does not establish a protected liberty interest in personal security from the possibility that people residing in the community with state support might pose a danger to others.

The circumstances alleged here also do not implicate the substantive due process right under the Fourteenth Amendment not to be deprived of life or liberty by virtue of a state-created danger. Plaintiffs rest their claims almost entirely on this right in their Complaint and in their briefs.

 As a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *see also Morse v. Lower Merion School District*, 132 F.3d 902, 907 (3d Cir. 1997); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982). However, courts have recognized two exceptions to this rule. One, the "special relationship" exception, allows a plaintiff to recover "when the state enters into a special relationship with a particular citizen ... [and] fails, under sufficiently culpable circumstances, to protect the health and safety of the citizen to whom it owes an affirmative duty." *Morse*, 132 F.3d at 907 (citing *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1369 (3d Cir. 1992) and *Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 713 (3d Cir.1993)). The other exception, the one alleged to apply here, is the state-created danger theory of liability. This theory has its roots in the case of *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. at 189, 109 S.Ct. 998, where the United States Supreme Court held that state actors violated no constitutional duty when they failed to protect a boy from his father, who beat him so severely after the state had received reports of possible abuse. The Supreme Court explained: "While the

State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201, 109 S.Ct. 998. Based on this language, several courts of appeals, including the Court of Appeals for the Third Circuit, have adopted a state-created danger theory of constitutional liability as a second exception to the rule that the State is not liable for failing to protect individuals from private violence.

 The Third Circuit has enunciated a four-part test for liability under this theory. It holds a state actor liable for a state-created danger if:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir.1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir.1995), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995)); *see also Morse*, 132 F.3d at 908 (citing *Kneipp*). The state-created danger theory provides no basis for relief here.

First, Plaintiffs do not allege that any private violence has occurred. Rather, they complain of a threat of private violence. To this Court's knowledge, the state's exposure of individuals to a threat of private violence has never been recognized as giving rise to a substantive due process claim under the state-created danger theory. While Plaintiffs may argue that the theory ought to be expanded, the Court sees no basis for enlarging its scope. *See Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir.1995), *cert. denied*, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996) (in applying state-created danger theory, bearing in mind "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope, *Collins[ v. City of Harker Heights Tex.*, 503

U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ]; (2) the concern that § 1983 not replace state tort law, *DeShaney,* 489 U.S. at 202, 109 S.Ct. 998 ...; and the need for deference to local policymaking bodies in making decisions impacting upon public safety, *Collins,* 503 U.S. at 128–29, 112 S.Ct. 1061"). Indeed, some Courts of Appeals have not even recognized that the state-created danger theory provides a basis for a substantive due process claim. *See, e.g., Randolph v. Cervantes,* 130 F.3d 727, 731 (5th Cir.1997) ("The state-created danger theory has not been adopted in this Circuit.").

Moreover, the test in this Circuit for when a state actor can be held liable for a state-created danger contemplates that some harm must have actually occurred. On the basis of the conduct alleged, it may be possible to judge whether the second prong of the test is satisfied, i.e., whether "(2) the state actor acted in willful disregard for the safety of the plaintiff." *Kneipp,* 95 F.3d at 1208. However, it is impossible, when no violent conduct has been alleged, to assess whether, under the first prong of that test, "(1) the harm ultimately caused was foreseeable and fairly direct," *id.,* and it is exceedingly difficult to judge, under the third and fourth prongs of the test, whether "(3) there existed some relationship between the state and the plaintiff," *id.,* who the test actually imagines as the victim, *see Morse,* 132 F.3d at 912–14, and whether "(4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur," *Kneipp,* 95 F.3d at 1208.

The threatened danger Plaintiffs allege may reduce the quality of life in the individual Plaintiffs' neighborhoods by resulting in their increased concern about security. However, as the Court of Appeals for the Second Circuit concluded in connection with the city's operation of a homeless shelter in *BAM Historic District Association v. Koch,* "the 'liberty' protected by the Fourteenth

Amendment ... does not include the maintenance of transient levels of the quality of neighborhood life." 723 F.2d at 237.

Even if the Third Circuit's four-pronged state-created danger test could be applied to the threat of private violence that the Plaintiffs allege the state has created here, the conduct alleged, as a matter of law, does not meet the test's requirements for imposing liability. The conduct alleged cannot support a determination, under the second prong of the test, that "the state actor acted in willful disregard for the safety of the plaintiff[s]." *Kneipp,* 95 F.3d at 1208. There are extensive state statutes and regulations that must be followed before a mentally ill patient is discharged from an institution to some other residential setting. There is nothing before the Court to demonstrate that these requirements of law have not been (or will not be) followed regarding residents at the West Orange locations, and the Court certainly will not assume that they were not. The Court now reviews those requirements.

By virtue of their discharge from Marlboro, the residents that Plaintiffs claim are dangerous to the community must, by New Jersey law, have met certain standards relevant to community safety. Each resident must have been determined by a court and/or that person's treatment team no longer "to need continued involuntary commitment." *See* N.J.S.A. 30:4–27.12; N.J.S.A. 30:4–27.15; N.J.S.A. 30:4–27.17. Thus, a court and/or treatment team must have determined that there is no "clear and convincing evidence," N.J.S.A. 30:4–27:15, that such residents are "dangerous to self or dangerous to others or property," N.J.S.A. 30:4–27.2(m). With respect to dangerousness to others, a court and/or treatment team must, by New Jersey law, have determined that there is no clear and convincing evidence that "by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future." N.J.S.A. 30:4–27.2(i).[6]

---

**6.** In addition, as a matter of New Jersey law, in the case of a person committed "pursuant to N.J.S.A. 2C:4–8 concerning acquittal of a criminal charge by reason of insanity or pursuant to

N.J.S.A. 2C:4–6 concerning lack of mental competence to stand trial," neither the treatment team nor the court could have discharged that person without affording the prosecuting attor-

Even accepting that the residents pose a heightened danger to the community, as Plaintiffs allege, the State Defendants act with assurances that there is no clear and convincing evidence that these residents pose a danger to others, including their neighbors.

In addition, the State Defendants act with assurances that the residents have been discharged under a scheme which would allow a court to place conditions on a patient's discharge if it found that there was no clear and convincing evidence that the patient was dangerous to self, others, or property, but other circumstances, relevant to community safety, warranted such restrictions. N.J.S.A. 30:4–27.15(c) provides:

> (1) The court may discharge the patient subject to conditions, if the court finds that the person does not need involuntary or continued involuntary commitment and the court finds:
>
> (a) that the patient's history indicates a high risk of rehospitalization because of the patient's failure to comply with discharge plans; or
>
> (b) *that there is substantial likelihood that by reason of mental illness the patient will be dangerous to himself, others or property if the patient does not receive other appropriate and available services that render involuntary commitment unnecessary.*

ney in the case notice and an opportunity to be heard. N.J.S.A. 30:4–27.15(e); N.J.S.A. 30:4–27.17(c). For a person involuntarily committed in a case in which the Attorney General or county prosecutor participated, that person could not have been discharged administratively upon a determination of the treatment team (as opposed to a court) without written notice and an opportunity to be heard being afforded to the person or persons who presented the case for involuntary commitment. N.J.S.A. 30:4–27.17(b). *See In Matter of Civil Commitment of G.A.,* 309 N.J.Super. 152, 161–64, 706 A.2d 1116 (App.Div.1998) (regarding importance of scheme allowing prosecutor to intervene).

**7.** N.J.S.A. 30:4–27.15(c) further provides:

> (2) Conditions imposed pursuant to this section shall include those recommended by the facility and mental health agency staff and developed with the participation of the patient. Conditions imposed on the patient shall be specific and their duration shall not exceed 90 days unless the court determines, in a case in

N.J.S.A. 30:4–27.15(c)(1) (emphasis added). Furthermore, this legislation establishes a mechanism for a court to maintain jurisdiction over such conditionally discharged patients and to ensure that conditions imposed on discharge are met.[7] The State Defendants act knowing that these safeguards are in place.

Finally, the State Defendants act with the assurances that the residences in which these individuals live with state support must, under New Jersey law, meet state requirements for providing "assistance in maintaining a basic level of self-care and in developing the [residents'] potential to live independently in the community," N.J.S.A. 30:11B–3, and must be licensed by the Department of Human Services under "[r]egulations [to] assure that essential life-safety, health and comfort conditions exit in a home-like atmosphere," N.J.S.A. 30:11B–4. Accordingly, for example, N.J.A.C. 10:37A–1.1 provides that community residence provider agencies ("PAs") "shall provide a residential care program to all enrolled clients." N.J.A.C. 10:37A–1.1(b). It further provides: "The major goal of the community residence program for mentally ill adults shall be to support and encourage the development of life skills required to sustain successful living within the community." N.J.A.C. 10:37A–1.1(c). It states:

> which the Attorney General or a county prosecutor participated, that the conditions should be imposed for a longer period. If the court imposes conditions for a period exceeding six months, the court shall provide for a review hearing on a date the court deems appropriate but in no event later than six months from the date of the order. The review hearing shall be conducted in the manner provided in this section, and the court may impose any order authorized pursuant to this section. (3) The designated mental health agency staff person shall notify the court if the patient fails to meet the conditions of the discharge plan, and the court shall issue an order directing that the person be taken to a screening service for an assessment. The court shall determine, in conjunction with the findings of a screening service, if the patient needs to be rehospitalized and, if so, the patient shall be returned to the facility. The court shall hold a hearing within 20 days of the day the patient was returned to the facility to determine if the order of conditional discharge should be vacated.
> N.J.S.A. 30:4–27.15(c)(2)–(3)

The residential care program shall have a rehabilitation focus designed to develop and improve skills necessary for successful community integration. Programming shall focus on empowering the client's use of generic community supports to meet physical, psychological and social needs as a means to promote an improved quality of life and emotional well-being. Clients shall live in the most normalized, least restrictive environment possible to promote individual growth and safety.

N.J.A.C. 10:37A–1.1(d). The regulations provide for licensing inspections and monitoring to ensure that provider agencies comply with statutory and regulatory requirements. *See* N.J.A.C. 10:37A–2.2; N.J.A.C. 10:37A–2.7; N.J.A.C. 10:37A–2.8.

Although the Court understands Plaintiffs' claim that New Jersey law does not require such residences to provide for the safety of the surrounding community, standards of care for mentally ill residents must be understood, by extension, to provide some degree of community safety by offering at least a basic level of care and one that focuses on *"successful community integration."* N.J.A.C. 10:37A–1.1(d) (emphasis added). The State Defendants act with the assurance that these safeguards are in place as well.

In *Uhlrig v. Harder,* 64 F.3d at 567, the United States Court of Appeals for the Tenth Circuit held that state defendants were not liable under the state-created danger theory for their decision to abolish a special unit for criminally insane patients leading to the release of a *criminally insane patient into the* general hospital population where he murdered a hospital employee. *Id.* at 572. The Court of Appeals determined that the state defendants had not "recklessly created the danger" that led to the woman's murder. *Id.* In doing so, they considered it significant that although the patient, who was hospitalized after acquittal on a charge of aggravated battery, had "attacked a patient before, he had also spent over a year in the general hospital population without incident." *Id.* at 575.

The Court believes that the State Defendants act with analogous assurances here. They know that the individuals whose hous-

ing they support have some history of dangerousness to self or others that led to their involuntary commitment, but they also know that, at present, these individuals are adjudged not to meet the standard for civil commitment and are receiving at least a basic level of care. If the housing at issue here were entirely private, rather than state supported, the Court knows of no grounds on which the municipality or the individual plaintiffs could prevent others with the psychiatric histories and diagnoses of the Project Live residents or others, such as ex-convicts, who could be predicted from past history to pose a heightened risk of dangerousness, from living in the same communities. *Cf. W.P. v. Poritz,* 931 F.Supp. 1199, 1203–05 (D.N.J.1996) (describing "Megan's Law," which contains no provisions barring any person from a chosen residence but requires only registration and community notification for certain convicted sex offenders residing in a community). Under the circumstances, the Court determines that the state's support of housing for mentally ill people determined by a court and/or a treatment team not to meet the standard for civil commitment does not rise to the level of willfully disregarding Plaintiffs' safety.

The Court finds further support for this conclusion in the case of *Randolph v. Cervantes,* 130 F.3d at 731. There, the United States Court of Appeals for the Fifth Circuit concluded that, under the state-created danger theory, if it were adopted, various state officials could not be held liable for injuries inflicted by a resident of state-owned apartments that were leased out to patients of a state mental health center. In that case, the mentally ill resident of state-supported housing inflicted injuries on herself. Nonetheless, as here, the state provided housing and support services to a mentally ill person who lived in the community having been determined not to meet the standards for civil commitment.

To prevail under the state-created danger theory, "[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not oth-

erwise have existed for the third party's crime to occur." *Johnson v. Dallas Indep. Sch. Dist.,* 38 F.3d 198, 201 (5th Cir.1994). "The key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.* (quotations and citations omitted). Viewing the evidence in the light most favorable to [the plaintiff], the defendants allowed and encouraged [the resident] to voluntarily reside at the Pine Hill apartments as a tenant having the right to come and go from the premises at any time and having the right to cancel her lease. This will not trigger a duty under the state-created danger theory ....

*Id.* at 731. Similarly, here, the State Defendants have facilitated housing and supportive services for individuals who no longer meet the standard for being involuntarily committed to a psychiatric hospital. The fact that they have done so could not trigger a duty to the residents under the state-created danger theory in light of *Randolph* and it can no more trigger such a duty to those residents' neighbors and the municipality in which they reside.

Solely for the purpose of adjudicating this motion, the Court accepts as true Plaintiffs' allegation that individuals such as those who fit the profile for Project Live's two residences pose a heightened risk of dangerousness to the community and are, under the scheme at issue, housed in residences with little security. However, the State Defendants' support of their housing under those circumstances cannot be said to amount to willful disregard of Plaintiffs' safety, any more than, for example, the State Defendants' facilitation of housing for poor people in the same neighborhood and with the same lack of security would, if it could be shown that there was a correlation between poverty and a heightened risk of dangerousness to the community. In *Uhlrig,* the Tenth Circuit noted, "[W]e must be careful not to second guess Defendants' decisions based on the benefit of hindsight, especially where their decision stemmed from a balancing of 'competing social, political, and economic forces.' *Collins,* 503 U.S. at 128, 112 S.Ct. 1061. As noted by the Supreme Court, decisions concerning the allocation of resources 'involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.' *Id.* at 129, 112 S.Ct. 1061." 64 F.3d at 576. Even if the state-created danger theory could be expanded to make the state liable for creating the threat of third-party violence when no violence had occurred, the circumstances alleged here would not satisfy the second prong of the Court of Appeals's test.

Briefly, the alleged conduct here also would not satisfy the third prong of the test, the "foreseeable plaintiff" prong, *Morse,* 132 F.3d at 912, which holds the state actor liable only if "there existed some relationship between the state and the plaintiff," *Kneipp,* 95 F.3d at 1208. In adopting the four-part test for liability under the state-danger theory, the Court of Appeals noted, "[T]he cases where the state-created danger theory [has been] applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury." *Kneipp,* 95 F.3d at 1208 (citing *Mark,* 51 F.3d at 1153). It "is clear ... that a member of the general public may not qualify" as a foreseeable plaintiff. *Morse,* 132 F.3d at 913; *see also Mark,* 51 F.3d at 1153 ("When the alleged unlawful act is a policy directed at the public at large— namely a failure to protect the public by failing adequately to screen applicants for membership in a volunteer fire company— the rationale behind the rule disappears— there can be no specific knowledge by the defendant of the particular plaintiff's condition, and there is no relationship between the defendant and the plaintiff."). However, the Court of Appeals has determined, "it would not appear that the state-created danger theory of liability under § 1983 always requires knowledge that a specific individual has been placed in harm's way." *Morse,* 132 F.3d at 914. Rather, it requires a discrete plaintiff or a discrete class of plaintiffs. *Id.* "The ultimate test is one of foreseeability." *Id.*

In *Cornelius v. Town of Highland Lake, Alabama*, 880 F.2d 348 (11th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), the United States Court of Appeals for the Eleventh Circuit held that genuine issues of material fact remained as to whether prison and town officials could be held liable under the state created-danger theory for placing dangerous prisoners in a community work squad program where one of them abducted and terrorized a town clerk. As to the town clerk's foreseeability as a plaintiff, the Court of Appeals explained:

> Th[e] awareness on the defendants' part [of the dangerousness of the situation], and their actions in creating the dangerous work squad situation and in assigning the inmates to work in and around the town hall, resulted in the defendants' placing [the town clerk], unlike other members of the general public, "in a unique, confrontational encounter with [persons] whom [the plaintiff showed] exhibited violent propensities."

880 F.2d at 359 (citations omitted). *Cornelius* provides some basis for the Court to conclude that at least the individual Plaintiffs here, by virtue of their residence in the neighborhoods immediately surrounding the community residences at issue, meet the foreseeable plaintiff test as members of a discrete class of plaintiffs who are uniquely subject to the alleged state-created danger, in a manner distinct from the general public.

However, in *Carlson v. Conklin*, 813 F.2d 769 (6th Cir.1987), and *Humann v. Wilson*, 696 F.2d 783 (10th Cir.1983), the United States Courts of Appeals for the Sixth and Tenth Circuits rejected claims against state defendants, directors of corrections departments and members of parole boards, by women who were sexually assaulted and otherwise injured by inmates in halfway houses in the community on the grounds that the harm done to the women was *too remote* for the state defendants to be held responsible. These Courts of Appeals determined that the victims did not stand in any special relationship to the perpetrators such that the state defendants might have inferred that there was a special danger to them that was not posed to other members of the public. *Carl-son*, 813 F.2d at 772; *Humann*, 696 F.2d at 784. The Courts of Appeals did not state explicitly whether the victims resided near the halfway houses, as the individual Plaintiffs reside near the community residences at issue here. However, they addressed a situation almost identical to that alleged to exist here: the State's housing in the community of potentially dangerous people without adequate provisions for community safety.

The Court believes that *Carlson* and *Humann* are more directly on point than *Cornelius*. Taking Plaintiffs' allegations as true as the Court must, the heightened danger posed by residents of the Project Live homes, like the danger posed by residents of the halfway houses in *Carlson* and *Humann*, is a danger to the public at large that is not visited uniquely on the homes' neighbors in the way that the danger posed by the community work program in *Cornelius* was visited uniquely on the discreet class of people who worked in the town hall where that program was confined. If the state-created danger theory could give rise to liability even when no private violence has occurred, the Court concludes, it would not apply in this case, since there exists no "relationship between the state and the plaintiff[s]," as there must under the third prong of the Third Circuit Court of Appeals's test. *Kneipp*, 95 F.3d at 1208.

. Finally, with respect to the fourth prong of that test, the Court determines that the conduct Plaintiffs have alleged would not support a determination that "the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." *Kneipp*, 95 F.3d at 1208. As the Court intimated above, the opportunity created for private violence to occur alleged in Plaintiffs' Complaint is not one that would not exist in the absence of the State Defendants' conduct. Unfortunately, levels of the quality of life in a neighborhood are transient, as the Second Circuit recognized in *BAM Historic District Assoc. v. Koch*, 723 F.2d at 237. Private action could easily result in changes in the neighborhood that would create opportunities for private violence that are alleged to exist here; for example, people meeting the Pro-

ject Live profile could move into the neighborhood without the support of the state.

At oral argument, Plaintiffs urged the Court to impose conditions on the operation of the Project Live homes, and perhaps other community residences, even if it was not willing to enjoin their operation. For example, Plaintiffs suggested that the Court order that the homes be kept locked and that residents not be permitted to leave the homes unescorted. Since Plaintiffs have alleged no constitutionally cognizable injury, the Court finds no basis upon which to award such relief. In addition, N.J.S.A. 30:4-27.15(c) allows courts to impose conditions of that sort on individual patients where necessary in the context of their discharge from psychiatric commitment. To the extent that N.J.S.A. 30:4-27.15(c) does not adequately address Plaintiffs' concerns, Plaintiffs' remedy resides with the legislature and with regulatory bodies. The Court can divine no legal basis for injecting federal courts into the micromanagement of community residences.

Counts I and II of Plaintiffs' Complaint fail to state cognizable claims that Plaintiffs' have been deprived of any substantive and procedural due process rights in violation of 42 U.S.C. § 1983. Because they fail to state a claim upon which relief can be granted, they will be dismissed.[8]

## B. Count III: "Declaratory Judgment and Injunctive Relief—Arbitrary and Capricious Nature of Siting"

Count III alleges:

The present system for funding and licensing community residences violates federal and state constitutional law by arbitrarily and capriciously ignoring the State's obligation to engage in a meaningful consideration of the impact of the proposed use upon the local interests, including consultation with local officials.

(Compl.¶ 169). Plaintiffs seek a declaratory judgment that the licenses given to Project Live for the two facilities were arbitrarily and capriciously granted and are therefore void. (*Id.* ¶ 171(a)). They also seek an in-

junction "[c]ompelling the State Defendants to promulgate procedures and practices providing meaningful consideration of the impact of the proposed community residence upon the neighborhood in which it is to operate, and to assure that proper safeguards for the safety of the community are in place." (*Id.* ¶ 171(b)). Finally, they seek an injunction preventing Project Live from operating either of the relevant facilities until it reapplies for licensure pursuant to those regulations and "upon due notice to Plaintiffs." (*Id.* ¶ 171(c)).

Plaintiffs apparently argue that the State Defendants' scheme of siting and licensing community residences, such as the two Project Live homes, unreasonably, arbitrarily and capriciously fails to take into account local interests as it must under *Garden State Farms, Inc. v. Bay II*, 77 N.J. 439, 390 A.2d 1177 (1978) and *Rutgers v. Piluso*, 60 N.J. 142, 286 A.2d 697 (1972). This argument is unavailing because the doctrine cited must be understood in light of the subsequently enacted amendments to the Fair Housing Act, 42 U.S.C. § 3601 et seq., and, thus understood, does not mandate the relief Plaintiffs seek.

*Rutgers v. Piluso* established that when government instrumentalities are entitled to immunity from local zoning ordinances, they may not "exercise[ ] [that immunity] in an unreasonable fashion so as to arbitrarily override all important legitimate local interests." 60 N.J. at 153, 286 A.2d 697. That case concerned development at Rutgers University, which was statutorily exempt from municipal zoning ordinances. The New Jersey Supreme Court added: "[A]t the very least, even if the proposed action of the immune governmental instrumentality does not reach the unreasonable stage for any sufficient reason, the instrumentality ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible." *Id.* at 154, 286 A.2d 697. *Garden State Farms* reaffirmed the holding in *Rutgers* in the context of the State Com-

---

8. Because the claims of all of the Plaintiffs are dismissed on these grounds, the Court need not

address whether § 1983 claims by a municipality can be maintained against the state.

missioner of Transportation's use of his authority as to the location of aeronautical facilities. 77 N.J. at 455, 390 A.2d 1177.

Other cases have extended *Rutgers* to the context of government instrumentalities' siting of group homes and treatment facilities. *See, e.g., Berger v. New Jersey,* 71 N.J. 206, 364 A.2d 993 (1976) (group home for multi-handicapped pre-school children and their foster parents); *Long Branch Division of the United Civic and Taxpayers Organization v. Cowan,* 119 N.J.Super. 306, 291 A.2d 381 (App.Div.1972), *certif. denied,* 62 N.J. 86, 299 A.2d 84 (1972) (drug treatment facility); *Township of Pemberton v. New Jersey,* 178 N.J.Super. 346, 429 A.2d 360 (App.Div.1981), *certif. denied,* 87 N.J. 364, 434 A.2d 1053 (1981) (group homes for juvenile delinquents). In *Berger* and *Township of Pemberton,* the courts determined that the government instrumentalities had not exercised their immunity unreasonably and arbitrarily so as to override all important legitimate local interests, based in part on evidence of the instrumentalities' consultation or planned consultation with local officials and in part on the Court's determination, after the presentation of evidence, that the nature of the projects involved did not implicate any legitimate community interests. *Berger,* 71 N.J. at 220, 364 A.2d 993; *Pemberton,* 178 N.J.Super. at 358–59, 429 A.2d 360. In *Long Branch Division of the United Civic and Taxpayers Organization,* the New Jersey Superior Court, Appellate Division, held that a hearing was required on whether the Department of Health had acted unreasonably and arbitrarily in selecting a site for a drug treatment facility where individual plaintiffs and the municipality objected to the location of the facility in a residential area, close to a church, a synagogue and a grammar school allegedly in "complete and total disregard of the needs and desires of the local government and citizens." 119 N.J.Super. at 309–10, 291 A.2d 381.

N.J.S.A. 40:55D–66.1 could be understood to render the State Defendants immune from local zoning ordinances in making decisions regarding licensing and siting of community residences. It provides in relevant part, "Community residences for the developmentally disabled, community shelters for victims of domestic violence and community residences for persons with head injuries shall be a permitted use in all residential districts of a municipality, and the requirements therefore shall be the same as for single family dwelling units located within such districts." [9] *Id.* In *Township of Pemberton v. New Jersey,* the Township challenged the Department of Corrections's siting of a group home for juvenile delinquents where a state statute, N.J.S.A. 40:55D–66, prohibited municipalities from enacting zoning ordinances that distinguished between groups of similar size who functioned as a family unit based on whether they had a blood relationship. 178 N.J.Super. at 356, 429 A.2d 360. The New Jersey Superior Court, Appellate Division, suggested that the Department of Corrections was immune and subject to the dictates of *Rutgers. Id.* N.J.S.A. 40:55D–66.1 is similar to the provision at issue in *Pemberton.*

Nonetheless, the Court determines that the New Jersey Supreme Court would decide, if confronted with the issue, that the State Defendants are not subject to the *Rutgers* requirements in siting and licensing community residences under N.J.S.A. 40:55D–66.1, in light of the intervening Fair Housing Amendments Act ("FHAA"), which prohibits discrimination in zoning against people with disabilities, including people who are mentally ill. In *City of Elizabeth v. State of New Jersey Dept. of Human Services,* No. UNN–L–7274–91 (N.J.Super. Ct. Law Div., Nov. 12, 1996), Judge Beglin addressed a similar challenge to the state's creation of a community residence covered by N.J.S.A. 40:55D–66.1 that was to provide housing for mentally ill adolescents. Intervenors argued, citing the *Rutgers* line of cases, much as Plaintiffs argue here, that the municipality and neighborhood residents had a right to notice and a hearing prior to the siting of the group home. Judge Beglin determined,

---

9. N.J.S.A. 40:55D–66.2(a) defines "community residence for the developmentally disabled" as, in relevant part, "a community residential facility licensed pursuant to [N.J.S.A. 30:11B–1 et seq.] providing food, shelter and personal guidance, under such supervision as required, to not more than 15 developmentally disabled or mentally ill persons . . . ."

"The *Rutgers v. Piluso* and *Long Branch v. Cow[a]n* cases predate the Municipal Land Use Law and the amendments to the Federal Fair Housing Act and are not helpful. Indeed, if such requirements were written into the Municipal Land Use Law, such would appear to constitute a violation of the Federal Fair Housing Act Amendments because it would be discriminatory, a requirement affecting only the handicapped persons constituting the group, when such is not required of other residents." (*Id.* slip op. at 68).

*Township of Pemberton v. New Jersey* was decided after the passage of the Municipal Land Use Law, N.J.S.A. §§ 40:55D–1 to –136, and relates to one of its provisions. Nonetheless, it does not address N.J.S.A. 40:55D–66.I, and it was decided before the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq., to which Judge Beglin referred in *City of Elizabeth*. The Court is not aware of any other decision addressing the applicability of the *Rutgers* line of cases either to N.J.S.A. 40:55D–66.1 or to the Fair Housing Act and its 1988 amendments.

The FHAA prohibits discrimination in housing on the basis of physical or mental disability. 42 U.S.C. § 3604(f)(1). Section 3604(f)(1) makes it unlawful:

[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or

(C) any person associated with that buyer or renter.

*Id.* In addition, the FHAA makes it unlawful to discriminate in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the handicap of ... that person." 42 U.S.C. § 3604(f)(2). Most importantly, for these purposes, the statute provides that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615.

The legislative history of the Fair Housing Amendments Act indicates that it was expressly intended to prevent municipalities from using their zoning authority to treat congregate living arrangements of unrelated people with disabilities differently from living arrangements of nondisabled people. The legislative history states:

[Section 3604(f)] would also apply to state or local land use and health and safety laws, regulations, practices and decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.

The Committee intends that the prohibitions against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice.

*Association for Advancement of the Mentally Handicapped Inc. v. City of Elizabeth*, 876 F.Supp. 614, 619–20 (D.N.J.1994) (citing *United States v. Schuylkill Township, Pa.*, 1990 WL 180980 *4–5 (E.D.Pa. November 16, 1990) (quoting H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 24, reprinted in 1988 U.S.Code Cong. & Admin. News at 2173, 2185)). This Court explained in *Association for Advancement of the Mentally Handicapped v. City of Elizabeth:*

Despite the broad reach of the FHAA, however, not all zoning ordinances which impact on the handicapped are per se invalid. "Rather Congress had indicated the FHAA is intended to allow reasonable government limitations so long as they are imposed on all groups and do not effectively discriminate on the basis of a handicap." 876 F.Supp. at 620 (citing *United States v. Schuylkill Township, Pa.,* 1990 WL 180980 *4–5). N.J.S.A. 40:55D–66.1 effectuates the Fair Housing Amendments Act by precluding municipalities from treating community residences for developmentally disabled people, including people with mental illness, differently from single family residences.

In light of the policies embodied in the Fair Housing Amendments Act and N.J.S.A. 40:55D–66.1, the Court determines that the New Jersey Supreme Court would not subject to the dictates of *Rutgers* the State's selection of sites for community residences in connection with the immunity provided by N.J.S.A. 40:55D–66.1. *Rutgers* requires that the state not exercise immunity from municipal zoning "in an unreasonable fashion so as to arbitrarily override all important legitimate local interests." 60 N.J. at 153, 286 A.2d 697. The Court believes that the Fair Housing Amendments Act and N.J.S.A. 40:55D–66.1 reflect a determination that there are no important legitimate local interests that could be unreasonably and arbitrarily overridden in the State's decision to site a community residence in an area zoned for single family residences. In *Long Branch Division of the United Civic and Taxpayers Organization,* the New Jersey Superior Court, Appellate Division, suggested that under *Rutgers,* the Department of Health could not site a drug treatment facility in complete and total disregard for the plaintiffs' and the municipality's objections to its location in a residential area, close to a church, a synagogue and a grammar school. 119 N.J.Super. at 309–310, 291 A.2d 381. It seems to the Court that the very purpose of

the Fair Housing Amendments Act and N.J.S.A. 40:55D–66.1 is to ensure that housing for people with disabilities, such as the community residences at issue, can, in fact, be sited in complete and total disregard of such objections.[10]

Other courts interpreting *Rutgers* have concluded that a government instrumentality's siting of a project or facility was not arbitrary or capricious after determining that no legitimate local interests were adversely effected. *See, e.g. Berger,* 71 N.J. at 220, 364 A.2d 993 ("We find nothing to convince use that [the residential home for handicapped children at issue] has such a detrimental effect [on the surrounding area] as to warrant judicial interference"); *Pemberton,* 178 N.J.Super. at 358–59, 429 A.2d 360 ("We are further persuaded that the project[, a group home for juvenile delinquents], by its nature, does not have the capacity to substantially impact adversely on legitimate local interests.... [W]e do not regard it as adversely impinging on the local zoning and land use prerogatives.... Nor are we able to perceive any non-land-use related legitimate interest of the community upon which this single home for six to eight pre-adolescent boys will intrude."). Those courts based their conclusions on evaluation of evidence, but this Court determines that, in light of the policies embodied in N.J.S.A. 40:55D–66.1 and the FHAA, it need not evaluate evidence in order to come to the same conclusion here.

The Court concludes that *Rutgers*'s consultation requirement similarly does not apply. The immunity afforded the state by N.J.S.A. 40:55D–66.1 mandates that municipalities not discriminate against people with disabilities who live in the community residences at issue. To require that, because of this type of immunity, state actors must "consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as

10. This conclusion is unaffected by *Growth Horizons, Inc. v. Delaware County, Pennsylvania,* 983 F.2d 1277 (3d Cir.1993), a case cited by Plaintiffs which held that a county could not be held liable under the FHAA for deciding not to lease certain housing on behalf of people with disabilities,

even if the county's decision was influenced by community bias against those people. The State Defendants have not made any such decision, and their liability under the Act to disappointed potential tenants is not at issue in the case at bar.

much as possible," (*Rutgers*, 60 N.J. at 154, 286 A.2d 697), would be at odds with the purposes of N.J.S.A. 40:55D–66.1 and the Fair Housing Amendments Act, or as Judge Beglin concluded "discriminatory, a requirement affecting only the handicapped persons constituting the group, when such is not required of other residents." *City of Elizabeth v. State of New Jersey Dept. of Human Services*, No. UNN–L–7274–91 (N.J.Super. Ct. Law Div., Nov. 12, 1996) (slip op. at 68); *see also Potomac Group Home Corp. v. Montgomery County, Maryland*, 823 F.Supp. 1285, 1296 (D.Md.1993) (holding ordinance requiring prospective providers of group homes for elderly first to notify neighbors and civic associations and invite comment was invalid under FHAA, concluding "[t]his requirement is equally as offensive as would be a rule that a minority family must give notification and invite comment before moving into a predominantly white neighborhood").[11]

In their papers, Plaintiffs repeatedly seek to rely on § 3604(f)(9) of the Fair Housing Amendments Act which states:

> Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result

in substantial physical damage to the property of others.

42 U.S.C. § 3604(f)(9). However, the allegations in the Complaint do not support any change in the Court's analysis based on that provision. Plaintiffs seek changes in the State's procedure for siting community residences generally and specific action with respect to the Project Live group homes. Section 3604(f)(9) provides no basis for treating as legitimate and important local interests a community's objections to the siting of the broad category of residences governed by N.J.S.A. 40:55D–66.1 or to such siting of the particular Project Live group homes at issue. In addition, it provides no support for requiring consultation with local officials as to siting decisions for the broader group of community residences governed by N.J.S.A. 40:55D–66.1 or the particular ones at issue here.

The legislative history of § 3604(f)(9) indicates that it is to be interpreted in accordance with the United States Supreme Court's decision in *School Board of Nassau County, Florida v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). *See In the Matter of the Commitment of J.W.*, 288 N.J.Super. 197, 205, 672 A.2d 199 (App.Div. 1996). *Arline* "insist[ed] on particularized proofs to justify discrimination against a disabled person, even one who is potentially

---

**11.** The Court also notes that the *Rutgers* line of cases does not establish that consultation with local officials must proceed by any formal mechanism, such as the "procedures and practices" the Plaintiffs ask that the State be ordered to promulgate here. (Compl.¶ 171(b); *see also* Pltfs.' Brf. Supp. Temporary and Preliminary Restraints at 35 ("*Rutgers* and *Garden State* have established a clear expectation of a right to a hearing ....")). For example, in *Mayor and Council of the Town of Kearny v. Clark*, 213 N.J.Super. 152, 516 A.2d 1126 (App.Div.1986), the court held that the county's siting of a jail without applying for a zoning variance was not arbitrary and capricious for failure to comply with "the local consultation requirement" articulated in *Rutgers*. *Id.* at 159–60, 286 A.2d 697. It explained: "The County Executive and Board of Freeholders apparently listened to local objections and considered them. *Rutgers v. Piluso* .:. requires nothing more." *Id.* at 160, 286 A.2d 697; *see also Berger v. New Jersey*, 71 N.J. at 220, 364 A.2d 993 (siting of group home for handicapped children not arbitrary and capricious where "[t]he State negotiated with officials of [the mu-

nicipality] to assure that [the home] would continue to be compatible in appearance with the neighborhood and met with concerned residents of the town"); *Pemberton*, 178 N.J.Super. at 358, 429 A.2d 360 (determining siting of group home for juvenile delinquents not arbitrary and capricious where Department of Corrections had a "general practice, intended to be followed here, of informing local authorities of its plans, accommodating specific local problems whenever possible and in general attempting amicably to resolve any conflicts with the community").

The Court also notes, in this regard, that Plaintiffs allege that the State Defendants participated in at least one meeting with area residents regarding the Project Live homes. (Compl.¶ 134). While the Complaint characterizes this meeting as distinctly unfruitful, the Court notes the New Jersey Supreme Court's comment in *Berger* that "[t]he fact that many of the residents voiced opposition to [the group home] does not, in and of itself, mean that the State acted unreasonably in proceeding with its plans." 71 N.J. at 220, 364 A.2d 993.

dangerous." *J.W.*, 288 N.J.Super. at 206–07, 672 A.2d 199. The Supreme Court held that deciding whether a teacher with tuberculosis would pose a risk of spreading the disease in the classroom required an "individualized inquiry." *Arline*, 480 U.S. at 287, 107 S.Ct. 1123. In *J.W.*, the New Jersey Superior Court, Appellate Division, concluded that notwithstanding 42 U.S.C. § 3604(f), statutes prohibiting the placement of people acquitted by reason of insanity in community residences violated the Fair Housing Act. The Court explained:

> *Arline* has a clear implication for the present case. It is that 42 U.S.C.A. § 3604(f)(1) forbids excluding a mentally ill person from an appropriate community residence merely because he or she falls within the category of persons acquitted by reason of insanity. That class undoubtedly includes persons who are potentially dangerous. But to warrant the exclusion, there must be particularized proof that an identified person would be potentially dangerous in a specific placement.

288 N.J.Super. at 207, 672 A.2d 199.

Similarly, the allegations in Plaintiffs' Complaint do not provide a basis to conclude that § 3604(f)(9) applies here. The Complaint includes no allegations of any particularized proof that would support denying the protections of the FHAA under § 3604(f)(9) to the class of disabled people who may live in community residences governed by N.J.S.A. 40:55D–66.1. Nor does it contain allegations of particularized proof that would support denying those protections to the residents of Project Live's homes. The Complaint alleges that the prospective residents at the two Project Live homes pose a heightened risk of dangerousness to the community based on certain elements of Project Live's profile for residents to be served by these homes, including past involuntary commitment, past failure in community settings, and certain psychiatric diagnoses. If it can be proven that these factors correlate with a heightened risk of dangerousness, however, that will no more constitute the particularized proof of an identified person's dangerousness required to implicate § 3604(f)(9) than proof that a person was acquitted by reason of insanity could satisfy that requirement in *J.W.* To the extent that they seek a change in the State's procedures relative to the siting of the group of community residences governed by 40:55D–66.1, Plaintiffs have, of course, made no allegations that would suggest there is particularized proof of an identified person's dangerousness which could support denying all people who live in such residences the protections of the FHAA under § 3604(f)(9).

Finally, the Court finds convincing the State Defendants' argument that § 3604(f)(9) is intended to establish an affirmative defense available to landlords and sellers of property in actions against them to enforce the FHAA, not to provide a basis for claims such as those asserted by the municipality and neighbors here. *See* House Report No. 711, 100th Cong.2d Sess. 28 (1988), 1988 U.S.C.C.A.N. 2173, 2189 (discussing relationship between FHAA and § 504 of the Rehabilitation Act and intention that FHAA, like § 504, extend protection from discrimination to "otherwise qualified" handicapped people, noting "An individual is not otherwise qualified if, for example, he or she would pose a threat to the safety of others, unless such threat can be eliminating by reasonable accommodation.") In this regard, the Court notes that even if § 3604(f)(9) could provide a basis for the Township's claims, plaintiffs' counsel acknowledged at oral argument that there is no municipal ordinance of general applicability restricting occupation of housing in West Orange by potentially dangerous people through which the municipality could claim to be asserting rights under that provision. Plaintiffs' further representation at oral argument that municipalities fear fair housing enforcement actions and therefore require the guidance of the courts in order to act, while possibly true, provides no support for Plaintiffs' claims here, as the Court may not issue such an advisory opinion.

The *Rutgers* and *Garden State Farms* line of cases does not support awarding the relief Plaintiffs seek, and Plaintiffs have argued no other basis for the claim asserted in Count III; therefore, that count will be dismissed for failure to state a claim upon which relief can be granted.

## C. Count IV: "Declaratory Relief— § 66.1 Void"

Count IV alleges "[T]he 'remnants' of § [§ ] 66.1 and 66.2[, N.J.S .A. 40:55D–66.1, N.J.S.A. 40:55D–66.2,] were either arbitrary *ab initio,* or have become arbitrary in light of the judicial destruction of the overall statutory scheme, such that the portion that remains is unenforceable." (Compl.¶ 174). Plaintiffs seek a declaratory judgment that these provisions of the New Jersey statutes are void. (*Id.*) They argue that § 66.2 is fatally overinclusive because it "arbitrarily includes, among various uses that would not pose a risk of violence to their neighbors, additional uses that would in fact clearly and foreseeably pose such a risk." (*Id.* ¶ 116). Specifically, they allege in the Complaint that § 66.2 arbitrarily treats alike group homes for victims of head injuries or mental retardation and "potentially violent uses," such as facilities for "persons released directly from psychiatric institutions, developmental cen-. ters (if 'highly aggressive,' as the State itself indicates almost one-quarter of that population to be)[, and] juvenile or correctional facilities,' and/or facilities bearing characteristics not of a 'family' but rather of an institutional use." (*Id.* ¶ 116). Furthermore, Plaintiffs argue that §§ 66.1 and 66.2 are void because court decisions invalidating parts of those provisions, (*ARC of New Jersey, Inc. v. State of New Jersey,* 950 F.Supp. 637 (D.N.J.1996) and *In the Matter of the Commitment of J.W.,* 288 N.J.Super. 197, 672 A.2d 199 (App.Div.1996)), have destroyed the balance that the statutory scheme originally struck between facilitating the establishment of various types of community residences and ensuring community safety. (*Id.* ¶¶ 119–127).

In their moving brief, Plaintiffs cite *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), as support for these arguments. (*See* Pltfs.' Brf. Supp. Temporary and Preliminary Restraints, at 32). They quote: "[T]he constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without reason for the prohibition." *Carolene Products,* 304 U.S. at 153–54, 58 S.Ct. 778. The Court notes that the Supreme Court continued: "But by their very nature such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it." *Id.* at 154, 58 S.Ct. 778. More recently, the Supreme Court has reiterated: "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Likewise, under state law, "It goes without saying that a legislative enactment is presumed valid and that the burden of proving invalidity of a statute is a heavy one." *Mental Health Association of Union County, Inc. v. City of Elizabeth,* 180 N.J.Super. 304, 309, 434 A.2d 688 (Law Div.1981) (citing *Velmohos v. Maren Eng. Corp.,* 83 N.J. 282, 416 A.2d 372 (1980)).

▉ The Court rejects Plaintiffs' contention that N.J.S.A. 40:55D–66.1 and N.J.S.A. 40:55D–66.2 are void as arbitrary *ab initio* because § 66.2 treats "potentially violent uses" and other uses alike. (*Id.* ¶ 116). The scheme does treat alike "[c]ommunity residences for the developmentally disabled, community shelters for victims of domestic violence and community residences for persons with head injuries." N.J.S.A. 40:55D–66.1. N.J.S.A. 40:55D–66.2 defines "community residence for the developmentally disabled" to include community residences for "developmentally disabled or mentally ill persons" and to "include, but not be limited to: group homes, half-way houses, intermediate care facilities, supervised apartment living arrangements and hostels." N.J.S.A. 40:55D–66.2(a). As recently amended in January 1998, these provisions also govern community residences for people who are terminally ill. P.L.1978 c. 321 (Jan. 8, 1998).

However, this scheme is not without rational basis. Judge Beglin of the New Jersey Superior Court, Law Division, rejected

Plaintiffs' argument in *City of Elizabeth v. State of New Jersey Dept. of Human Services*, No. UNN–L–7274–91 (N.J.Super. Ct. Law Div., Nov. 12, 1996), concluding "the legislature has found each of these groups independently has a right to housing in the community." (slip op. at 69). The Court agrees. As Judge Beglin stated, "there is nothing unlawful in the enactment of one piece of legislation addressing the community residences for members of three groups." *Id.* The Court concludes that there is similarly nothing unlawful in the enactment of one piece of legislation addressing the various types of community residences at issue, group homes, half-way houses, intermediate care facilities, supervised apartment living arrangements, and hostels. The legislature's decision to provide specially, and in the same way, for housing in the community for these various groups and of these various types "is not without support in reason" so as to be arbitrarily overinclusive, and without a rational basis, in the contemplation of *Carolene Products*, 304 U.S. at 153–54, 58 S.Ct. 778.

In addition, the Court determines that N.J.S.A. 40:55D–66.1 and N .J.S.A. 40:55D–66.2 have not become arbitrary and void due to decisions invalidating portions of N.J.S.A. 40:55D–66.1 and N.J.S.A. 40:55D–66.2. To reiterate, plaintiffs argue that two invalidating decisions have rendered these provisions arbitrary and void by destroying

the balance the legislature struck between facilitating community residences and providing for community safety. In *ARC of New Jersey, Inc. v. State of New Jersey*, 950 F.Supp. 637 (D.N.J.1996), this Court invalidated under the FHAA, portions of N.J.S.A. 40:55D–66.1 that authorized municipalities: 1) to treat as a conditional use any community residence or shelter housing seven or more persons, 2) to deny a conditional use permit to any proposed such residence or shelter housing over seven people which would be located within 1500 feet of another community residence or shelter, and 3) to deny such a permit whenever the number of people living in existing community residences or shelters in a locality exceeded 50 people or 0.5% of the municipal population.[12] 950 F.Supp. at 646; *see also Association for Advancement of the Mentally Handicapped*, 876 F.Supp. at 625 (invalidating spacing and ceiling quota provisions). In *J.W.*, also under the FHAA, the New Jersey Superior Court, Appellate Division, invalidated a portion of N.J.S.A. 40:55D–66.2 that made mentally ill people found incompetent to stand trial or not guilty by reason of insanity automatically ineligible to reside in the community residences for the mentally ill that are governed by N.J.S.A. 40:55D–66.1.[13] 288 N.J.Super. at 208, 672 A.2d 199.

These decisions did not render the remaining provisions of N.J.S.A. 40:55D–66.1 or N.J.S.A. 40:55D–66.2 arbitrary and void. In

---

**12.** The Court held the following portions of section 66.1 null and void "as they apply to community residences for the developmentally disabled as defined in [N.J.S.A.] 40:55D–66.2":

.... provided, however, that, in the case of a community residence for the developmentally disabled, community shelter for victims of domestic violence or community residence for persons with head injuries housing more than six persons, excluding resident staff, a zoning ordinance may require for the use or conversion to use of a dwelling unit to such a community residence or shelter, a conditional use permit in accordance with section 54 of the act to which this act is a supplement [§ 40:55D–67]. Any requirements imposed for the issuance of a conditional use permit shall be reasonably related to the health, safety and welfare of the residents of the district; provided, however, that a municipality may deny such a permit to any proposed community residence for the developmentally disabled, community shelter for victims of domestic violence or community residence for persons with head

injuries which would be located within 1500 feet of an existing such residence or shelter; provided, further, however, that a municipality may deny the issuance of any additional such permits if the number of persons, other than resident staff, resident at existing such community residences or community shelters within the municipality exceeds 50 persons, or 0.5% of the population of the municipality, whichever is greater.

950 F.Supp. at 647 n. 15.

**13.** N.J.S.A. 40:55D–66.2 defined the community residences for the developmentally disabled that are the subject of N.J.S.A. 40:55D–66.1 to include facilities housing "mentally ill persons," and it excluded from the definition of "mentally ill person," "a person who has been committed after having been found not guilty of a criminal offense by reason of insanity or having been found unfit to be tried on a criminal charge." N.J.S.A. 40:55D–66.2.

*ARC of New Jersey,* the Court examined relevant statutory severability provisions and held that the Court's invalidation of portions of N.J.S.A. 40:55D–66.1 did not make the rest of that section void. 950 F.Supp. at 647 (examining severability clauses at N.J.S.A. 1:1–10 and N.J.S.A. 40:55D–66.3). Indeed, N.J.S.A. 40:55D–66.3 which was enacted with § 66.1 and § 66.2 establishes: "If any provision of this act or the application thereof to any person or circumstance is found unconstitutional, the remainder of this act and the application of such provisions to other persons or circumstances shall not be affected thereby, and to this end the provisions of this act are severable."

In January 1998, the New Jersey State Legislature amended N.J.S.A. 40:55D–66.1 and N.J.S.A. 40:55D–66.2, removing the portions of the statute that were invalidated in *ARC of New Jersey* and *Association for Advancement of the Mentally Handicapped* and reenacting the remainder of those provisions along with amendments related to community residences for people who are terminally ill. P.L.1978 c. 321 (Jan. 8, 1998). The bill was enacted with the notation: "Amends zoning enabling statute to comport with federal 'Fair Housing Amendments Act of 1988.'" *Id.* The bill did not remove the provisions invalidated in *J.W.,* and those also were not addressed in *ARC of New Jersey,* since *J.W.* had not been decided. Nonetheless, the severability provision of N.J.S.A. 40:55D–66.3 indicates the legislature's intent that the portions of sections 66.1 and 66.2 that remain valid should continue to apply.

Consistent with *ARC of New Jersey, J.W.,* N.J.S.A. 40:55D–66.3, and the recent amendment, the Court cannot conclude that sections 66.1 and 66.2 as altered to comport with the Fair Housing Amendments Act have suddenly become irrational. Both these sections and the FHAA seek to integrate people with mental illness into the community. The invalidated portions were struck down because they were determined to be discriminatory, arguably the opposite of rational, in violation of federal law. In *ARC of New Jersey,* this Court determined that the state had failed to prove that the invalidated provisions served a legitimate state interest. 950 F.Supp. at 645.

In *J.W.,* the court essentially determined that the provisions it invalidated allowed stereotypes and unfounded fears to serve as a basis for discrimination. 288 N.J.Super. at 206–08, 672 A.2d 199 (citing *Arline,* 480 U.S. at 287, 107 S.Ct. 1123 ("[individualized] inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks") and citing *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1503 (10th Cir.1995) ("Restrictions predicated on public safety cannot be based on blanket stereotypes about the handicapped, but must be tailored to particularized concerns about individual residents")). The invalidation of these provisions can only have made the statutory scheme more rational, not less so. It cannot be said that no "state of facts either known or which could reasonably be assumed affords support for" sections 66.1 and 66.2. *See Carolene Products,* 304 U.S. at 154, 58 S.Ct. 778. Count IV, too, fails to state a claim upon which relief can be granted.

## D. Count V: "Declaratory Judgment— Federal Fair Housing Act"

In Count V, Plaintiffs seek a declaratory judgment that pursuant to § 3604(f)(9) of the Fair Housing Act, "plaintiffs (and others similarly situated) may properly request (and must be given, at penalty of non-approval of the requested housing) information concerning the histories of persons placed in community residences upon an articulable and well-founded belief that such persons, by present conduct or by admitted diagnoses, presents [sic] a direct threat of safety to others in the community." (Compl.¶ 183). In reviewing *in camera* the records of the anticipated individuals who will first occupy the Dogwood and Edgewood residences, this Court determined that nothing in that inquiry revealed any heightened danger to persons or property in the West Orange community. The Court continues to hold that view and further determines that the present plaintiffs do not enjoy the rights asserted in Count V.

Briefly, as explained above, 42 U.S.C. § 3604(f)(9) provides: "Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." The accompanying federal regulations reiterate this language. 24 C.F.R. § 100.202(d). However, in the same section, they also establish: "It shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is ... sold, rented or made available, or any person associated with that person, has a handicap or to make inquiry as to the nature or severity of a handicap of such a person." 24 C.F.R. § 100.202(c). The regulations make exceptions for five inquiries as long as they are made of all applicants, whether or not they have handicaps,[14] and none of those five exceptions applies to the inquiry intended here.

The regulations do not explain how one is to determine whether a person constitutes "a direct threat to the health or safety of other individuals" or a threat to their property, see 42 U.S.C. § 3604(f); 24 C.F.R. § 100.202(d), without making a prohibited inquiry, see 24 C.F.R. § 100.202(c). However, when housing providers brought this to the attention of the regulators, HUD declined to alter the regulations to allow inquiries regarding any "history of antisocial behavior or tendencies." 54 Fed.Reg. 3232, 3247. It explained: "Language such as this might well be seen as creating or permitting a presumption that individuals with handicaps generally pose a greater threat to the health or safety of others than do individuals without handicaps. Such a presumption is unwarranted and would run counter to the intent and purpose of the Act." *Id.* HUD noted that, in accordance with the legislative history of the statute, the "direct threat" language of 24 C.F.R. § 100.202(d) should be interpreted consistently with the United States Supreme Court's decision in *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). 53 Fed.Reg. 44,992, 45002.

In the context of a dispute over discovery of patient histories for the preliminary injunction hearing, the Court attempted to reconcile the apparent conflict in the regulations while bearing in mind the state mandate that psychiatric files generally be kept confidential, see N.J.S.A. 30:4-24.3, and state and federal recognition of the psychiatrist-patient privilege, see N.J.S.A. 45:14B-28; *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 1931, 135 L.Ed.2d 337 (1996). The Court reviewed *in camera* redacted patient histories of current and expected future residents of the two Project Live homes to determine whether 42 U.S.C. § 3604(f)(9) was implicated. It determined that nothing in those files evidenced that the residents "would constitute a direct threat to the health and safety of other individuals," or that they were likely to cause any "substantial physical danger to the property of others." Accordingly, the Court modified an order by the Magistrate Judge that those documents be produced to Plaintiffs. (Letter, Apr. 3, 1998 and Order dated Apr. 14, 1998).

The Court determines that, at least in light of the posture of this litigation,[15] the proce-

---

**14.** According to the regulations:

[T]his paragraph does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps:
(1) Inquiry into an applicant's ability to meet the requirements of ownership or tenancy;
(2) Inquiry to determine whether an applicant is qualified for a dwelling available only to persons with handicaps or to persons with a particular type of handicap;
(3) Inquiry to determine whether an applicant for a dwelling is qualified for a priority available to persons with handicaps or to persons with a particular type of handicap;

(4) Inquiring whether an applicant for a dwelling is a current illegal abuser or addict of a controlled substance;
(5) Inquiring whether an applicant has been convicted of the illegal manufacture or distribution of a controlled substance.
24 C.F.R. § 100.202(c).

**15.** If the Court had realized that Plaintiffs' claims were wholly without merit before it became necessary to conduct discovery on the preliminary injunction hearing, it might not have had to address the discovery issue and review the patient histories at all. The filing of nonmeritorious lawsuits ought not, in general, to afford plaintiffs the opportunity for discovery of confi-

dure it followed best satisfied the competing demands of the federal statute and regulations in accordance with *Arline,* and state and federal recognition of the importance of confidentiality of psychiatric records.[16] The Court further determines, based on the same analysis, that the declaratory judgment Plaintiffs seek would be contrary to law. Count V fails to state a claim upon which relief can be granted and accordingly will be dismissed.

### E. Count VI: "Ultrahazardous Use Without Due Safeguards—Project Live"

 In Count VI, Plaintiffs claim under state law that Project Live's two group homes constitute an ultrahazardous use engaged in without proper safeguards and, alternatively, an impermissible nuisance. (Compl.¶¶ 189–90). They ask that Project Live be enjoined from maintaining the proposed uses. (*Id.* ¶ 190). The Complaint makes no allegation that any specific problems have arisen with respect to either of the Project Live homes. The Court concludes that the allegations in Plaintiffs' Complaint do not support a determination that the homes constitute ultrahazardous uses or nuisances by virtue of their very existence. Such a determination would be inconsistent with N.J.S.A. 40:55D–66.1, N.J.S.A. 40:55D–66.2, which expressly permit community residences of the type alleged in the Complaint. *See City of Elizabeth v. State of New Jersey Dept. of Human Services,* No. UNN–L–7274–91 (N.J.Super. Ct. Law Div., Nov. 12, 1996) (slip op. at 70) ("I cannot find a private nuisance has been created [by the proposed community residence for adolescents] when such a community residence is a permitted use, and therefore, a reasonable, publicly beneficial use, and, of course, this home has

not yet been occupied"). Accordingly, Count VI will be dismissed.

### F. Count VII: "Declaratory Judgment—First Amendment"

 In Count VII, Plaintiffs claim that HUD's past enforcement actions under the Federal Fair Housing Act and its amendments against citizens exercising "their constitutional rights to free speech and/or to petition the government ... for redress" and "the possibility of private enforcement actions by organizations such as Project Live[ ] have had a chilling effect upon the citizens and governmental officials in this State, including plaintiffs." (Compl.¶¶ 193–94). They seek declaratory and injunctive relief:

(a) Declaring that the plaintiffs may engage in free speech, and may petition the government, including the Courts, for redress, without liability under the Fair Housing Act for engaging in protected constitutional activity.

(b) Enjoining HUD, Verniero, Project Live, and/or any prospective residents of the Project Live facilities or their representatives to the extent within Defendants' control or acting in concert with defendants, from commencing any enforcement action or asserting any claim against plaintiffs under the Federal Act without (a) a good-faith showing that plaintiffs have engaged in non-protected activity, and (b) prior leave of Court.

(*Id.* ¶ 195).

The Complaint alleges: "HUD participated with the State Defendants and Project Live at a meeting with area residents where a brochure describing the Fair Housing Act and its enforcement mechanisms were [sic] distributed. This constituted at least an implicit threat of retribution for any opposition to the Project Live Facilities, thus having a

---

dential psychiatric records of mentally ill people seeking housing in the community nor should it allow plaintiffs to have a court review such records *in camera* to determine whether 42 U.S.C. § 3604(f)(9) justifies their disclosure. This is particularly evident, given the Court's conclusion that 42 U.S.C. § 3604(f)(9) constitutes an affirmative defense for a reluctant property owner, and not an independent basis for suits of the type brought here. By reciting here its prior review of these patient histories, the Court is not going

outside the pleadings as contemplated by Fed. R.Civ. P. 12(b)(6). It does so to illustrate the procedure it concludes should precede disclosure of residents' psychiatric histories. On its face, Count V states no cognizable claim.

**16.** The Court also concludes that any resolution of an arguable conflict between these principles must be legislative.

chilling effect on the Plaintiffs' right of expression." (*Id.* ¶ 134). The Complaint also discusses several past cases that it alleges reflect HUD's use of the Fair Housing Act to abridge citizens' First Amendment rights, (*id.* ¶¶ 135–40), and bills pending in Congress that it alleges are designed to curb HUD's excesses in this regard, (*id.* ¶¶ 143–48).

The claim in Count VII of Plaintiffs' Complaint lacks merit and will be dismissed. The only factual allegations in support of Plaintiffs claim that they are at any risk of being denied their First Amendment rights by an illegal enforcement action are 1) that HUD, the State Defendants, and Project Live distributed informational literature on the Fair Housing Amendments Act at a community meeting and 2) that HUD has on other occasions been censured for abridging individuals' First Amendment rights in its fair housing enforcement. The Court need not accept Plaintiffs' conclusory allegation that the distribution of literature on the Fair Housing Amendments Act at a community meeting constituted an implicit threat of retribution. In addition, Plaintiffs' allegations regarding HUD's past activities are of little consequence in the Court's evaluation of HUD's or the other Defendants' behavior or likely behavior in the context of this action. "If a declaratory judgment [under 28 U.S.C. § 2201] is sought to protect against a feared, future event, 'the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Gruntal & Co., Inc. v. Steinberg*, 854 F.Supp. 324, 333 (D.N.J.1994), *aff'd* 46 F.3d 1116 (3d Cir.1994) (quoting *Salvation Army v. Department of Community Affairs*, 919 F.2d 183, 192 (3d Cir.1990) (quoting *Steffel v. Thompson*, 415 U.S. 452, 460, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)). Based on the allegations in their Complaint, Plaintiffs cannot make such a showing. Accordingly, Count VII will be dismissed for failure to state a claim upon which relief can be granted.[17]

**G. Plaintiffs' Motion for a Preliminary Injunction**

Because the Court determines that Plaintiffs have not stated a single claim upon which relief can be granted, their Complaint will be dismissed. Accordingly, the Court need not consider Plaintiffs' application for a preliminary injunction.

### *CONCLUSION*

For the foregoing reasons, Defendants' and Defendant–Intervenors' cross-motions to dismiss will be granted pursuant to Fed. R.Civ.P. 12(b)(6). Plaintiffs' motion for a preliminary injunction will be dismissed as moot.

### *ORDER*

For the reasons set forth in the Court's Opinion filed herewith,

It is on this 29th day of April, 1998,

**ORDERED** that Defendants' and Defendant–Intervenors' cross-motions to dismiss be and they hereby are granted pursuant to Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiffs' motion for a preliminary injunction be and it hereby is dismissed as moot.

---

17. Although the line between dismissals based upon Fed.R.Civ.P. 12(b)(1) and 12(b)(6) is often unclear, the Court determines here that its jurisdiction has been adequately invoked but that

Count VII fails to state a cognizable claim. *Accord, Growth Horizons Inc.*, 983 F.2d 1277, 1280–81.